FILED

02 SEP 23 PM 3: 40

CLERK ... ....... ..CURT
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| EDWARD VAN REUTH, OTTO P. REINERT, TODD RENDAHL, PAUL MOULARD, and STEVEN A. VAUGHAN, on behalf of themselves and all others similarly situated, | ) ) ) ) ) |
| Plaintiffs | ) Case No. 8:01-CV-2282-T-23MAP ) ) |
| v. | ) ) |
| SRI SURGICAL EXPRESS INCORPORATED, RICHARD T. ISEL, and JAMES T. BOOSALES, | ) ) ) |
| Defendants. | ) ) ) |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANTS' MOTION TO DISMISS

**CAULEY GELLER BOWMAN & COATES, LLP**
Howard K. Coates, Jr.
Fla. Bar No. 0714305
Jack Reise
Fla. Bar No. 058149
One Boca Place
2255 Glades Road, Suite 421A
Boca Raton, FL 33431
Tel: (561) 750-3000
Fax: (561) 750-3364

**MILBERG WEISS BERSHAD HYNES & LERACH LLP**
Kenneth J. Vianale
Fla. Bar No. 169668
Maya Saxena
Fla. Bar. No. 0095494
5355 Town Center Road, Suite 900
Boca Raton, FL 33486
Tel: (561) 361-5000
Fax: (561) 367-8400

**Co-Lead Counsel for Plaintiffs**

TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT ...................................... 1

II.    FACTUAL BACKGROUND ........................................ 3
       A.    *Background to the Class Period* ................................. 3
       B.    *Defendants Knew About SRI's Declining Sales Through Weekly Call*
             *Reports* ........................................................ 5
       C.    *Defendants' Fraudulent Revenue Recognition Practices* ............. 6
       D.    *SRI's Third Quarter 2001 "Product Dumping" In California* ........ 10
       E.    *SRI Experiences - - And Fails To Disclose - - Revenue Shortfalls As A*
             *Result Of Customer Contract Cancellations* .......... 11
       F.    *Defendants' False Statements During the Class Period* ............. 12

III.   ARGUMENT .................................................. 13
       A.    *Defendants' Fraud is Pled with Particularity* ..................... 14
       B.    *The Complaint More Than Adequately Pleads Scienter* ............. 18
             1.    Defendants Knew of or Recklessly Disregarded the Company's
                   Fraudulent Sales and Revenue Recognition Practices ......... 19
             2.    Defendants' Accounting Violations Contribute to a Strong
                   Inference Of Severe Recklessness ....................... 25
                   a.    Defendants failed to Properly Account for Interest Rate
                         Swaps ...................................... 26
                   b.    Defendants' Restatement Contributes to an Inference of
                         Severe Recklessness ............................ 29
                   c.    Plaintiffs' Allegations Concerning Loss of
                         Customers are Material ........................ 31
       C.    *The Complaint Adequately Pleads the Involvement and Scienter of*
             *Each of the Individual Defendants* .............................. 34
             1.    Each of the Individual Defendants Acted With
                   Knowledge or Severe Recklessness ....................... 34
             2.    The Group Pleading Presumption Applies ................. 37

IV.    CONCLUSION ................................................ 38

Plaintiffs respectfully submit this memorandum of law in opposition to the

Motion of Defendants SRI/Surgical Express, Inc. ("SRI" or the "Company"), Richard T.

Isel ("Isel"), Wayne R. Peterson ("Peterson") and James T. Boosales ("Boosales")

(collectively, "defendants") to Dismiss Plaintiffs' Consolidated Amended Class Action

Complaint (the "Complaint").[1]

## I.    PRELIMINARY STATEMENT

Rather than disappoint the market with less than stellar revenue and earnings

reports for the third quarter of 2001, defendants set out on a path to deny the inevitable:

that its revenue and earnings were declining as a result of, among other things, the

substantial loss of numerous customers that had reacted adversely to buried price

increases the company had attempted to pass along.  The path chosen by defendants,

although well traveled by many in the corporate community these days, was the one better

left not taken – it was the path of deception, deceit, and fraud.

Despite the historical stability of the Company's revenue stream, defendants, just

prior to the beginning of the Class Period,  knew that the Company's reputation for

revenue and earnings stability was in jeopardy as a result of declining revenues and

earnings.  In not so new twists on old ways to boost quarter-end revenue, the Company

devised methods – albeit improper – to avoid paying the piper.  Rather than accepting the

hard and true facts concerning their Company's quarterly performance, defendants set

---

[1]References to the Complaint will be cited as "¶ ___."

about to do what can only be described as nothing more than classic "cooking the books." For instance, when it became clear that the Company would not meet its numbers or market expectations, defendants sought to invoice some of the Company's larger hospital customers for one or two days of products, which would be delivered during the following week – that is to say in the new business quarter. With a conscious effort to deceive the market and the Company's public shareholders, defendants' conduct was more than just a violation of generally accepted accounting principles ("GAAP"), it was securities fraud.

And in conduct reminiscent of the practices followed by other companies attempting to distort revenue by channel-stuffing and other means (e.g., Sunbeam), during the third quarter of 2001, defendants flooded SRI customers with unordered goods, and invoiced and recognized revenue from products that had not yet been delivered, or accepted by the customer. Euphemistically referred to internally by the Company as *"repeat deliveries,"* these deliveries were the implementation of defendants' scheme to deceive and defraud. Tellingly, when these *"repeat deliveries"* and *"product dumps"* were refused by SRI's customers, the deliveries were hidden by the Company in an off-site warehouse and were *not* re-entered back into the Company's inventory system. Again, this was not just merely a violation of GAAP, but a conscious, knowing fraud.

As shown below, defendants furthered their scheme in numerous ways by failing to disclose the loss of substantial customers, as well as by failing to disclose that the Company guaranteed certain financial transactions (which exposed the Company to a risk

- 2 -

of loss)," despite the fact that GAAP provides that such guarantees "shall be" disclosed as a contingency of the Company. Although defendants minimize the severity of their actions by describing the Company's restatement (which flowed directly from the Company's revenue recognition improprieties and GAAP violations) as a matter of only a "few pennies," the indictment of this position is well illustrated by the market's substantial negative reaction (i.e., plunging over 40%) upon having the truth revealed.

As shown below, the Complaint well satisfies the pleading requirements for stating a claim for violation of Section 10(b) of the Exchange Act. Accordingly, defendants' motion to dismiss should be denied in its entirety.

## II.    FACTUAL BACKGROUND

### A.    *Background to the Class Period*

Prior to the Class Period, SRI struggled with a low stock-price and an inability to gain market attention. ¶ 21. Defendants knew that, to continue to attract additional investment and analyst interest, it was crucial to meet analysts' estimates and to continue posting strong quarter after quarter revenue growth. ¶ 22. Indeed, during the Class Period, analysts flocked to SRI, noting time and again that the Company was a stable, conservative player in an otherwise unstable market. *Id.* For example, a July 24, 2001 report published by Robert W. Baird analyst Larry Neibor noted that "*the recurring revenue situation at STRC, which has been at 95% for some years, lends a high amount of stability to the picture.*" *Id.* Similarly, a May 2, 2001 report by Neibor stated . . . "STRC has demonstrated 95% recurring revenues over the last five years. *We believe this*

- 3 -

*attribute may continue to prove attractive to a market beset by numerous revenue disappointments." Id.*

Immediately prior to the Class Period, defendants realized that SRI's image as a pillar of revenue stability in an otherwise unpredictable market was rapidly dissolving - - and that an adverse impact on SRI's market capitalization would quickly follow. ¶ 23.  In late 2000 and early 2001, according to several former employees, SRI was losing a material amount of customers due to a planned price increase in the cost of SRI reusable goods. *Id.*  In addition, SRI had recently begun its ambitious laparoscopy program,[2] which was not yielding the financial benefits defendants expected in time to compensate for the loss of customers. *Id.*

An additional contributor to SRI's revenue squeeze during the Class Period was the pricing impact of group purchasing contracts[3] on SRI's profits. When SRI signed a contract with a large group, SRI had to pay an administrative fee of between 2% and 5% of estimated sales, which cut into profits. ¶25.  SRI gambled on closing enough individual customers to increase revenue and offset the fee for each particular quarter. *Id.*

_____

[2] In early 2001, in an aggressive change in corporate direction, defendants moved away from the Company's historical emphasis in providing reusable products such as surgical gowns to hospitals, and to SRI's new "laparoscopic" business. ¶ 18.  The new "focus" included adding a full line of laparoscopic instruments to SRI's core reusable product offering, as well as developing a sales force dedicated to selling its new service program, called "SRI/Surgical Express for Laparoscopy." ¶ 20.

[3] A group purchasing organization (GPO) negotiates volume discount contracts with its suppliers, on behalf of its members facilities, providing members with more favorable pricing, terms and conditions, and other benefits. ¶ 25 n.5.

- 4 -

Any hospitals that were part of a group that was already an SRI customer would receive

an immediate price reduction due to the new group purchasing agreement, which had an

immediate negative impact on revenue until the generation of new customer revenue. *Id.*

**B.     Defendants Knew About SRI's Declining Sales Through Weekly Call Reports**

Defendants knew about declining sales during the Class Period, and particularly

the third quarter, through receipt of "call reports." ¶ 26.  These "call reports" were

submitted weekly via e-mail to Regional Sales Managers, who consolidated the data from

territory account managers and submitted the data to Director of Sales, Alex Edwards.[4]

*Id.*  The call reports included data evidencing the sales representatives' number of

completed sales, names of hospitals visited, and other sales information.[5]  *Id.*

With the cumulative impact of revenue pressures resulting in such negative

consequences as the delayed profitability of the laparoscopic division, defendants knew

through the receipt of weekly sales data that it would be impossible to continue to meet

analysts' earnings estimates for the third quarter of 2001.  *Id.*  As a result, to falsely

inflate revenues in the third quarter, the defendants perpetrated a scheme to artificially

boost third quarter revenues by sending out unwanted "repeat deliveries" to customers,

and recognizing revenues from product which had not even been shipped.  *Id.*

_____

[4]Edwards reported directly to Defendant Isel.  ¶ 26.

[5]All purchasing was handled through corporate headquarters in Tampa.  ¶ 29 n.8.
*Defendants had access to all of SRI's computerized invoices, purchasing, and sales
information.  Id.*

**C.**   ***Defendants' Fraudulent Revenue Recognition Practices***

Defendants engaged in a variety of improper activities to boost quarter-end revenues for quarters in which the Company was experiencing revenue shortfalls. ¶ 28. The normal delivery process at the Company was a "replenishment system" with deliveries Monday through Friday. ¶ 29. Deliveries were made based on the history of the client's needs, with supplemental orders to fill in specific requirements because of fluctuations in surgical procedures. *Id. However, the normal "replenishment system" was abandoned by employees at quarter-end if sales were less than forecasted or less than the employees' sales quota mandated by corporate headquarters in Tampa. Id.*

According to a former SRI Production Supervisor, at the close of each business quarter, the General Manager of the Houston facility instructed her to invoice some of the larger hospitals for one or two days of products, which would be delivered during the following week – in the new business quarter – in order to "make up money" and receive sales-based commissions. ¶ 30. Employees "knew what revenue numbers they needed to achieve" and the General Manager would specify what specific hospitals to fraudulently invoice if revenues were off in order to increase SRI's sales and revenue for the ending quarter. *Id.* For example, if the business quarter ended on Friday, the General Manager would identify certain customers to invoice by Friday, ***and those shipments would not be shipped until the following week which fell in the new business quarter. Id.*** According

- 6 -

to this former employee, this improper quarter-end practice went on undetected for years - - at least between 1994 and 2001[6]. *Id.*

During the third quarter of 2001, defendants' fraudulent practices increased.[7] SRI flooded customers with unordered goods, and invoiced and recognized revenue from products that had not yet been delivered, or accepted by the customer. ¶ 31. These deliveries were referred to internally as *"repeat deliveries,"* which were described as:

> "[A] normal cart delivery (filled with reusable products) would be delivered to the customer on 31[st] of a month, and another, *unordered*, separate cart delivery would be made to the customer on the 1[st] of the following month. ***The cart delivery made to the customer on the 1[st] of the following month would be dated the 31[st], which enabled SRI/Surgical Express to factor in the cart deliveries into the previous quarters sales numbers.***"

Id.

***Employees were ordered to make "repeat deliveries" on account of the Company's recent lack of sales.*** ¶ 32. SRI was careful only to make "repeat deliveries"

---

[6]Defendants argue that the allegation in ¶ 30, that defendants' fraudulent revenue recognition practices "went on undetected for years" is inconsistent with ¶ 35, which alleges that the amount of carts being delivered "dramatically increased" in late September 2001, and that a former employee had never seen such an increase in his ten years with the Company. Def. Br. at 14. n.15. There is nothing inconsistent about these allegations. The Complaint alleges that SRI's *regular operating practice* involved fraudulently inflating revenue through manipulating the timing of customer shipments. ¶¶ 30, 31. These improper practices *increased* during the third quarter of 2001. ¶¶ 31-37. The fact that defendants' improper sales tactics were magnified in the third quarter is entirely consistent with the Complaint's allegations.

[7]Isel was personally motivated to pump up the price of SRI stock during 2001, since he received a $3 million personal loan from SRI board member, Lee Kemberling. The loan was to fund Isel's investment in an unrelated company, ***and is secured by a pledge of 200,000 of Isel's SRI shares.*** ¶ 27.

- 7 -

to customers which, based on SRI's past experience, were more likely to miss the

unwanted delivery and invoices. *Id.* Some of the hospitals victimized by SRI's repeat

delivery scam during the end of the third quarter were Bel Air Hospital, St. Johns

Hospital, and Bayou City Hospital, among others. *Id.* But the fraudulent scam extended

beyond these customers and touched many of the Company's customers throughout the

Houston, San Antonio and Austin area during the third quarter of 2001. *Id.* In addition,

employees in the Houston facility openly discussed *that this fraudulent "repeat delivery"*

*practice was going on nationwide throughout the Company during the third quarter of*

*2001. Id.* If any customers "caught on to the repeat deliveries" employees were

instructed to use the excuse: *"[s]omething is wrong with SRI/Surgical Express's*

*computer system and we are trying to fix it." Id.* Not coincidently, *this was the same*

*excuse* proffered by defendant Isel during an April 3, 2002 interview with the *St.*

*Petersburg Times. Id.*

SRI's fraudulent practices were also confirmed by a former Houston-based

Distribution Supervisor, who described the third-quarter end activities in detail, and

realized "that something strange was going down in the Tampa corporate office" during

the third quarter of 2001, and that "the whole company [was] headed downhill." ¶ 34. In

late September 2001, towards the end of the quarter, *the amount of carts being delivered*

*to hospital customers "dramatically increased."* ¶ 35. According to this former

employee who worked for the Company for over ten years, *"[n]ever before in my history*

*of working for the facility did this [dramatic short-term increase in deliveries] ever*

*happen." Id.*

The former Distribution Supervisor stated that, as part of general procedures, various order clerks out of SRI's service centers entered orders from hospital customers. ¶ 37. A "picking employee" within the shipping department of the Houston facility received the customer orders via SRI's Computerized Inventory System – "AS400" system – which indicated how much reusable and disposable product they needed to pull from the facility shelves to place into a single cart. *Id.* Each customer required a different mixture of reusable and disposable products per cart and the contents of each cart were "custom assembled." *Id.* Once the carts were assembled, they were rolled over to the shipping area, where they were scanned for shipment and recorded as a sale inside the AS400 system. *Id.* Within the same day, the carts were scanned as shipped, the trucks picked up the carts and delivered the carts to the customers, where they would be accepted by the customer. *Id.*

Since the hospitals' purchase orders did not reflect the orders of extra carts, the majority of customers refused delivery of these extra carts, which the truck drivers brought back to the Houston facility. ¶ 38. The Facility Manager instructed the Distribution Supervisor to take the returned carts to an off-site warehouse. ¶ 39. Before the carts were transferred to the off-site warehouse, the carts were *not* virtually re-entered back into the AS400 inventory system. *Id.* Thus, they no longer existed in the inventory records since they were recorded as being shipped out and having counted as a sale.

- 9 -

### D.    *SRI's Third Quarter 2001 "Product Dumping" In California*

According to a former SRI Account Representative, product sales and gross profits were declining significantly as early as December 2000. ¶ 41.  In late December 2000 or early January 2001, Tampa-based Sales Operations Manager Candice Turtizo began "aggressively" bombarding Stockton Facility Plan Manager Phillip Nagata and himself with weekly faxes and e-mails detailing the GP (gross profit) of each product per hospital customer in the Stockton area.  *Id. Turtizo's communications indicated a significant number of existing accounts that were "too low" on particular reusable and disposable products.  Id.*  The emails and faxes from corporate headquarters in Tampa portrayed a clear picture that SRI "was not performing as well as they would have liked it to."  *Id.*

*Because of the ongoing revenue shortfall at SRI, the former Account Representative reported that he was "ordered" to boost profits, and as a result of the order to boost profits, the SRI corporate office in Florida planned in advance to "dump product" on its hospital customers the last Friday of the third quarter of 2001.*  ¶ 42. About a week before the last Friday of the third quarter, Facility Plant Manager Nagata informed the former Account Representative that *corporate executives from the Florida office had instructed all plant managers to deliver extra product to hospital customers. Id.*

- 10 -

**E.**     ***SRI Experiences - - And Fails To Disclose - - Revenue Shortfalls As A Result Of Customer Contract Cancellations***

Defendants also knew, and failed to disclose, that, starting in late 2000, SRI lost 25% of its hospital customers in the Dallas Territory. According to a former Dallas-based Account Manager, by the end of 2001, the company lost 10 to 15 customers (out of 35-45 customers total) from the Dallas territory. Larger hospital customers that SRI lost out of the Dallas territory during the Class Period included hospitals under the Columbia/HCA Healthcare Group and Presbyterian Hospital. ¶ 46.

The customer attrition resulted from SRI's decision to raise prices between 5% to 50% on its reusable products beginning in the first quarter of 2000. ¶ 47. Hospital customers that belonged to other group purchasing organizations (such as Columbia/HCA Healthcare and Presbyterian Hospital) were dissatisfied with the price increases involving SRI's reusable products and chose to buy reusable products through their own GPOs (that purchased reusable products from industry competitors such as Allegiance and Med-Line). *Id.* SRI/Surgical Express lost both Columbia/HCA Healthcare Group and Presbyterian Hospital members to competitor Allegiance and Med-Line, who both undercut SRI/Surgical Express's prices for reusable products.

**F.    _Defendants' False Statements During the Class Period_**

Despite SRI's declining sales, defendants issued a series of press releases during

the Class Period touting SRI's "record" financial results.[8]  In response, the price of SRI

stock soared to over $41 per share in September 2001, and SRI was named to the _Forbes_

magazine list of the best small companies in the country. _Id._

On November 27, 2001, defendants revealed that the Company's previously

issued financial statements for the third quarter of 2001 were false. ¶ 94.  Defendants

publicly disclosed that the Company's revenues and earnings were actually $1,034,000

and $262,000 less, respectively, than previously reported, and $.04 less per diluted share.

_Id._ _**These "newly" issued results did not meet analysts' estimates.**_ ¶ 96.  Isel blamed

the third quarter restatement on the Company's conveniently planned excuse -- computer

problems with SRI's billing system. ¶¶ 91-93.  In response to the news that SRI would

not meet third or fourth quarter analyst estimates and had improperly recognized revenue

in the third quarter of 2001, SRI _**stock plunged over 40%,**_ closing at $14.63 on November

28, 2001, on unusually high volume of 2.7 million shares. ¶ 98.

The full extent of SRI's fraud, however, was still unknown to the market.  On

April 1, 2002, defendants issued a report on Form 10-K/405, revealing that SRI's fourth

---

[8]These false statements included: (1) a March 30, 2001 10-K; (2) an April 23,
2001 press release reporting "record" first quarter 2001 results; and a 10-Q for the period
ending March 31, 2001; (3) a July 23, 2001 press release and 10-Q for the period ending
June 30, 2001; (4) an October 22, 2001 press release and third quarter 10-Q; and (5) a
February 25, 2002 press release. ¶¶ 50-101.

quarter and year end 2001 results, announced on February 25, 2002, were false, and had

also been overstated. ¶ 101. Indeed, the Form 10-K revealed that *all of SRI's 2001 SEC*

*filings were false and failed to disclose the existence of interest rate swaps entered into*

*prior to the Class Period.*[9] ¶ 102. As a result of properly accounting for these "swaps,"

defendants revealed that SRI would have to take an "accounting adjustment" which

resulted in SRI reporting net income per share of $0.83, rather than the $0.89 per share

previously reported. *Id.* In the same filing, defendants revealed that the SEC had

commenced a formal investigation into SRI's third quarter and the events surrounding

SRI's restatement. ¶ 103. In response to the news, SRI stock dropped even further, from

$15.77 to $13.35 on April 2, 2002.[10] ¶ 105.

## III.   ARGUMENT

On a motion to dismiss, the Court must construe the complaint in the light most

favorable to plaintiffs, and all facts alleged must be accepted as true.[11] A motion to

---

[9]An "interest rate swap" is an agreement to swap interest rate exposures from floating to fixed or vice versa. There is no swap of the principal. It is the interest cash flows (payments or receipts) that are exchanged.

[10]To date, SRI stock has not recovered. On September 26, 2002, SRI stock was trading at approximately $9.30 per share, a far cry from its Class Period high of $41.30.

[11]*Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 161 (2d Cir. 2000); *Jackson v. Okaloosa County, Florida*, 21 F.3d 1531, 1534 (11th Cir. 1994); *In re Paradyne Networks, Inc. Sec. Litig.*, 197 F. Supp.2d 1349, 1352 (M.D. Fla. 2002); *In re Clarus Corp. Sec. Litig.*, 201 F. Supp.2d 1244, 1248 (N.D. Ga. 2002). *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1335 (S.D. Fla. 1999).

- 13 -

dismiss must be denied unless it appears beyond a doubt that the plaintiff can prove no set of facts entitling him to relief.[12]

The PSLRA does not abrogate the well-settled principle that dismissal on a Rule 12(b)(6) motion is appropriate <u>only</u> when it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. *Hishon v. King & Spalding*, 467 U.S. 69 (1984).[13]

### A.   *Defendants' Fraud is Pled with Particularity*

A complaint alleging securities fraud must satisfy the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. *See PSS World Medical*, 2002 U.S. Dist. LEXIS 14887 at *17-18; *Sensormatic*, 2002 U.S. Dist. LEXIS 10715 at *7; *Clarus*, 201 F. Supp.2d at 1248.  Rule 9(b) provides that "malice, intent, knowledge, and other condition of mind of a person may be averred generally." *PSS World Medical*, 2002 U.S. Dist. LEXIS 14887 at *17.  Rule 9(b) is satisfied by alleging the "who, what, when and

---

[12]*Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Shands Teaching Hosp. & Clinics, Inc. v. Beech St. Corp.*, 208 F.3d 1308,1310 (11th Cir. 2000); *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271 ,1273 n.1 (11th Cir. 1999); *In re Paradyne*, 197 F. Supp.2d at 1352.

[13]Courts in this Circuit continue to apply that rule in securities class actions. *See In re PSS World Medical, Inc. Sec. Litig.*, Case No. 3-01-CV-795-J-16-TEM, 2002 U.S. Dist. LEXIS 14887 (M.D. Fla. Aug. 1, 2002); *In re Sensormatic Elec. Corp. Sec. Litig.*, No. 01-8346-CIV-HURLEY, 2002 U.S. Dist. LEXIS 10715 (S.D. Fla. June 10, 2002); *Paradyne.*, 197 F. Supp. 2d at 1349; *Sherleigh Assoc., LLC v. Windmere-Durable Holdings, Inc.*, No. 98-2273-CIV-LENARD/TURNOFF, 2000 U.S. Dist. LEXIS 9772, *26 (S.D. Fla. June 8, 2000); *In re Premiere Tech. Inc., Sec. Litig.*, No. 1:98-CV-1804-JOF, 2000 U.S. Dist. LEXIS 19207 (N.D. Ga. Dec. 8,2000); *McBride v. Vision Twenty-One*, No. 8:99-CV-138-T-27F, 2000 U.S. Dist. LEXIS 14742 (M.D. Fla. Aug. 8, 2000).

where" in connection with the allegedly fraudulent statements. *See Clarus*, 201 F. Supp.2d at 1248.

The PSLRA's pleading requirements were not intended to be insurmountable. "[T]he Complaint need only provide a reasonable delineation of the underlying acts and transactions allegedly constituting the fraud." *Anderson v. Transglobe Energy Corp.*, 35 F. Supp. 2d 1363, 1369 (M.D. Fla. 1999); *accord, Page v. Derrickson*, No. 96-842-Civ-T-17C, 1997 U.S. Dist. LEXIS 3673, at *26 (M.D. Fla. March 25, 1997).[14]

Plaintiffs allege the names of persons involved in the fraud (¶¶ 12-13), the documents that evidence the fraud (¶¶ 50-101); the actions of the defendants in perpetrating the fraud (¶¶ 26, 28-39, 42-45, 48, 50-101); the names of hospitals who were victims of the repeat deliveries and fraudulent invoices and the names of customers who refused unordered product (¶¶ 32-33, 38); and the names of customers who canceled contracts with SRI (¶¶ 46, 49).   Plaintiffs have further alleged detailed information about the sources of the facts alleged that is more than sufficient to establish their credibility and reliability. *See* ¶¶ 15, 16, 23, 24, 26, 28-34, 36-46, 48, 49.   Indeed, the Complaint's level of specificity is rarely found in such pleadings absent discovery and exceeds the

---

[14]*See also In re Ikon Office Solutions Inc., Sec. Litig.*, 66 F. Supp. 2d 622, 626 (E.D. Pa. 1999)("we are mindful that at this stage in the proceedings, the court should not look to whether plaintiffs will 'ultimately prevail'; it should only consider whether they should be allowed to offer evidence in support of their claims.").

level of particularity required by Rule 9(b), the PSLRA, and courts within the Eleventh Circuit.[15]

Defendants argue that the Complaint fails to plead fraud with particularity, criticizing plaintiffs for only identifying by name three hospitals[16] that were flooded with unordered goods, and for failing to allege "the dollar amounts involved." Def. Br. at 14-15. But exact quantification of defendants' fraud, absent discovery, is not necessary to survive a motion to dismiss. *See, e.g., In Re Computer Assoc. Class Action Sec. Litig.,* 75 F. Supp.2d 68, 73 (E.D.N.Y. 1999) ("Unknown specifics, such as the exact dollar amount the earnings have been overstated, are not fatal in this case. Plaintiffs allege such a widespread fraudulent practice, that if true, would have a material net effect as to the company's overall figures and is the type of information peculiarly within the defendants' control".); *Chu v. Sabratek Corp.,* No. 99 C 0351, 2000 U.S. Dist. LEXIS 8337, at *17 (N.D. Ill. June 12, 2000) (failure to plead the dollar amounts by which a company's financial statements are allegedly misstated by does not doom complaint); *Bell v. Fore Sys., Inc.,* 999 U.S. Dist. LEXIS 7808, *17 (W.D. Pa. 1999) (court rejected defendants'

---

[15]*See e.g., Windmere,* 2000 U.S. Dist. LEXIS 9772 at *3; *Sunbeam,* 89 F. Supp. 2d at 1335; *Zuckerman v. Smart Choice Automotive Group, Inc.,* No. 6:99-CV-237-Orl-99A, 2000 U.S. Dist. LEXIS 14676, at *3-4 (M.D. Fla 2000).

[16]Defendants also contend that plaintiffs have failed to specify which hospitals were involved in the "product dumping." Def. Br. at 15. However, in ¶ 43, plaintiffs specifically identify UC Davis and Mercy General as hospitals that were victims of SRI's excess product deliveries. Defendants argument that ¶ 43 does not specify the names of hospitals involved is misplaced. Def. Br. at 15.

argument on motion to dismiss that plaintiffs failed to set forth claims with specificity

where complaint alleged defendants used improper accounting practices, engaged in

improper revenue recognition, failed to disclose material adverse business trends, and

made misleading statements through securities analysts); *Danis v. USN Comm., Inc.,* 73

F.Supp.2d 923, 935, n.6 (N.D. Ill.1999) ("Plaintiffs need not state the amount by which

USN's financial statements were in error. While this information is absent from the

complaint, and while plaintiffs will be required to fill in these details in order to prevail

on their claims, most of this information is in the hands of the defendants and plaintiffs

have satisfied their burden at this stage in the litigation.") quoting *In re First Merchants*

*Acceptance Corp. Sec. Litig.*, No. 97 C 2715, 1998 U.S. Dist. LEXIS 17760, at *11 (N.D.

Ill. Nov. 4, 1998) *citing DiVittorio v. Equidyne Extractive Industries, Inc.,* 822 F.2d 1242,

1247 (2d Cir. 1987).

   In *PSS World Medical*, the Court rejected defendants' arguments concerning the

purported infirmities of plaintiffs' complaint that are strikingly similar to the arguments

asserted by defendants here. 2002 U.S. Dist. LEXIS 14887 at *22, *35-*36.[17] As the

Court in *PSS World Medical* held, plaintiffs are not required to plead their complaint with

---

[17]The Court also distinguished *Malin v. IVAX Corp.*, 17 F. Supp.2d 1345, (S.D.
Fla. 1998) and *In re Sunstar Sec. Healthcare Litig.*, 173 F. Supp.2d 1315 (M.D. Fla.
2001), two cases heavily relied on by defendants here. And, as in *PSS World Medical*,
"[t]his case presents clearer allegations of wide departures from accounting principles and
fraudulent activities on the part of the [d]efendants than were presented in cases such as
*Malin*, 17 F. Supp.2d at 1361, and *In re Sunstar*, 173 F. Supp.2d at 1319-20." *PSS World
Medical*, 2002 U.S. Dist. LEXIS 14887 at *41.

- 17 -

exacting detail (such as exact dollar amounts involved in allegedly fraudulent

transactions), as long as they "provide[] enough descriptive corroboration to satisfy their

pleading requirements." *Id.* at *33, *35.

Accordingly, plaintiffs have pled Defendants' fraud with particularity, in

compliance with Rule 9(b) and the PSLRA. *See Zuckerman*, 2000 U.S. Dist. LEXIS

13489 at *12 (finding that the pleading requirements of the PSLRA were satisfied where

allegations were based upon public filings and information obtained from knowledgeable

former employees).

**B.     *The Complaint More Than Adequately Pleads Scienter***

To adequately plead scienter a complaint must allege facts that give rise to a

strong inference that the defendant acted consciously or with severe recklessness. *Bryant,*

187 F.3d at 1285.  In assessing whether the element of scienter has been adequately

alleged, the court considers the allegations in their totality. *See, e.g., In re:*

*Microstrategy, Inc., Sec. Litig.,* 115 F. Supp.2d 620, 631 (E.D. Va. 2000)(the

consideration of scienter involves a three step analysis: first, the court must identify the

factual allegations that, taken as true, are relevant to proving the defendant's state of

mind; second, the court must assign probative weight to each fact and inference which

relates to state of mind; and third, the court must, in the totality of circumstances,

holistically examine the potentially synergistic combination of such facts and inferences);

*In re Miller Industries, Inc. Sec. Litig.,* 12 F.Supp.2d 1323, 1332 (N.D. Ga.

1998)("Plaintiffs' allegations, taken together as a whole, create a strong inference that the

- 18 -

Defendants possessed a mental state embracing intent to deceive, manipulate, or defraud.").

The Eleventh Circuit also held in *Bryant* that "motive and opportunity are specific kinds of evidence, which along with other evidence <u>might contribute to an inference of recklessness or willfulness</u>."(Emphasis Added).  Thus evidence of defendants' motive to artificially inflate the value of SRI stock during the Class Period supports the inference of recklessness or wilfulness. *Bryant ,* 187 F.3d 1271, 1286.

When analyzed in context, and in their totality, the allegations set forth by plaintiffs establish a strong and compelling inference that defendants either knew, or recklessly disregarded, that sales were declining, SRI employees were engaging in blatantly improper sales practices to meet defendants' mandated sales quotas, and SRI's financial statements failed to reflect the existence of interest rate swaps.  ¶¶ 26, 28-39, 42-45, 48, 53.

### 1.     Defendants Knew of or Recklessly Disregarded the Company's Fraudulent Sales and Revenue Recognition Practices

The Complaint alleges that defendants committed a variety of fraudulent acts, including: (a) invoicing customers and recognizing sales from product shipments that had not been delivered to the customer or accepted to *"make up money"* ¶ 30;  and (b) using "repeat deliveries" to flood customers with product in excess of a customer's order, and storing product in an off-site warehouse if the excess was discovered by the customer. ¶¶ 2, 32, 39.  These fraudulent practices resulted in several hospitals notifying SRI that

Defendants possessed a mental state embracing intent to deceive, manipulate, or defraud.").

The Eleventh Circuit also held in *Bryant* that "motive and opportunity are specific kinds of evidence, which along with other evidence <u>might contribute to an inference of recklessness or willfulness</u>."(Emphasis Added).  Thus evidence of defendants' motive to artificially inflate the value of SRI stock during the Class Period supports the inference of recklessness or wilfulness.  *Bryant ,* 187 F.3d 1271, 1286.

When analyzed in context, and in their totality, the allegations set forth by plaintiffs establish a strong and compelling inference that defendants either knew, or recklessly disregarded, that sales were declining, SRI employees were engaging in blatantly improper sales practices to meet defendants' mandated sales quotas, and SRI's financial statements failed to reflect the existence of interest rate swaps.  ¶¶ 26, 28-39, 42-45, 48, 53.

### 1.    Defendants Knew of or Recklessly Disregarded the Company's Fraudulent Sales and Revenue Recognition Practices

The Complaint alleges that defendants committed a variety of fraudulent acts, including: (a) invoicing customers and recognizing sales from product shipments that had not been delivered to the customer or accepted to ***"make up money"*** ¶ 30;  and (b) using "repeat deliveries" to flood customers with product in excess of a customer's order, and storing product in an off-site warehouse if the excess was discovered by the customer. ¶¶ 2, 32, 39.  These fraudulent practices resulted in several hospitals notifying SRI that

- 19 -

they received product they did not want and had not ordered, and resulted in SRI's third

quarter restatement of financial results. ¶¶ 38, 94. The following factors contribute to a

strong inference of severe recklessness and/or willfulness:

- Defendants' new focus on laparoscopy did not yield the anticipated profitability, and defendants were forced to "make up money" to boost profits. ¶ 20

- Defendants were strongly motivated to foster the impression that SRI had gone through a "remarkable turnaround" and was able to produce recurring, stable revenue and regularly meet Wall Street estimates.[18]  ¶21.

  Defendants received "call reports" throughout the Class Period that informed them that third quarter sales would not meet analysts' estimates absent extraordinary - - and fraudulent methods.[19]  ¶ 26. These "call reports" were submitted weekly via e-mail to Regional Sales Managers, who consolidated the data from territory account managers and submitted the data to Director of Sales, Edwards. *Id.* The call reports included data evidencing the sales representatives' number of completed sales, names of hospitals visited, and other sales information. *Id.* Edwards reported directly to Defendant Isel. *Id.*

- Defendants had access to all of SRI's computerized invoices, purchasing, and sales information. ¶ 30, n.8.

---

[18]The desire to meet Wall Street estimates has long been recognized as a powerful motivator for defendants to engage in securities fraud. *See Microstrategy,* 115 F. Supp.2d 620 at 646 (scienter adequately alleged where defendants were motivated to engage in fraud and issue false financials in order to *inter alia,* meet Wall Street estimates). *See also Zuckerman,* 2000 U.S. Dist. LEXIS 14676 at *3-4 (defendants were motivated to issue false financial statements to post another "good quarter" and meet analysts' expectations).

[19]In *Novak v. Kasaks,* 216 F.3d, 300, 301, 311 (2d Cir. 2000), the Second Circuit reversed the dismissal of a securities fraud case where defendants knew, or should have known of inventory manipulations through, *i.e.,* receipt of weekly inventory status reports. *See also In re Scholastic Corp. Securities Litigation,* 252 F.3d 63, 72, 73 (2d Cir. 2001).

- The Company's repeat delivery practice was going on nationwide during the third quarter of 2001.  ¶ 32.

- If customers "caught on to the repeat deliveries" the General Manager instructed employees to use the false excuse; *"[s]omething is wrong with SRI/Surgical Express's computer system and we are trying to fix it"* - - *the same excuse* proffered by defendant Isel during an April 3, 2002 interview with the *St. Petersburg Times*.  ¶ 32.

- The third quarter restatement constitutes an admission that SRI's third quarter financial results were false and could not be relied on.  ¶ 94.

- Because of the ongoing revenue shortfall at SRI, the former Account Representative reported that he was "ordered" to boost profits, and as a result of the  order to boost profits, the SRI corporate office in Florida planned in advance to "dump product" on its hospital customers the last Friday of the third quarter of 2001.  About a week before the last Friday of the third quarter, Facility Plant Manager Nagata informed the former Account Representative that *corporate executives from the Florida office had instructed all plant managers to deliver extra product to hospital customers.*  ¶ 42.

- Defendants secreted rejected products to an offsite warehouse for up to a month – but recognized revenues on the date the products were sent out, even though the products were rejected.  ¶ 45.

- Standard Textile Company, a business partner of SRI's and an "affiliated person" with inside knowledge of SRI's business and operations, filed Form 144s with the SEC evidencing an intent to sell $5.85 million worth of SRI stock through its broker,  McDonald Investments, *before the stock crashed*.  McDonald Investment analysts Hans vonder Luft and Alexandra Hall covered SRI stock, and regularly attended meetings with SRI Management.  ¶ 78.

- Isel received a $3 million personal loan from SRI board member, Lee Kemberling.  The loan was to fund Isel's investment in an unrelated company, *and is secured by a pledge of 200,000 of Isel's SRI shares.*[20]  ¶ 27.

---

[20]Defendants take issue with this multi-million dollar loan, arguing that plaintiffs failed to disclose that the loan was not made until January 2002, after the November 2001 stock price decline, "rendering it impossible for the loan to have supplied a motive for Isel to "pump up the price of SRI stock." Def. Br. at 28.  This argument is misplaced.

- 21 -

- SRI headquarters intentionally tried to hide price increases in order to "pull a fast one over the hospital customers." ¶ 48.

- Customers were required to give 90-day cancellation notices when terminating an SRI service contract. Accordingly, defendants knew many of its customers were ending their contracts, contrary to defendants' contention that the loss of customers was unanticipated. ¶ 60, 61.

In arguing that the Complaint is bereft of particularized allegations establishing a link between defendants and the fraud, defendants disregard allegations that SRI's repeat delivery practice was going on nationwide during the third quarter of 2001. ¶ 32. Numerous courts have held that knowledge concerning the core operations of a defendant's business can be imputed to the defendant for the purpose of establishing scienter. Here the fact that this "product dump" was occurring nationwide strongly supports the inference that this was a policy directed by senior management. *See In re Aetna Inc. Sec. Litig.*, 34 F. Supp.2d 935, 953 (E.D. Pa. 1999)("facts critical to a business' core operation or an important transaction are so apparent that their knowledge may be attributed to the company and its officers."); *Epstein v. Itron, Inc.*, 993 F.Supp. 1314, 1326 (E.D. Wash. 1998)(holding that strong inference of scienter could be made where the defendant's core product was ". . . technologically incapable of meeting requirements

---

The April 9, 2002 Proxy also expressly states that the loan was granted because of Isel's "ownership of shares of common stock of the Company that are worth much more than the loan amount." In addition, while defendants would rather ignore the additional allegations regarding the failure to disclose the existence of interest rate swaps, the Class Period extends until April 1, 2002, at which time these "swaps" were revealed and SRI stock dropped an additional 15%. ¶ 105. Accordingly, the loan supplies a powerful reason for Isel to inflate the price of SRI stock for at least four months of the Class Period.

- 22 -

that [were] central to Itron's continued survival a business entity."); *In re Peoplesoft, Inc. Sec. Litig.,* No. C 99-00472 WHA , 2000 U.S. Dist. LEXIS 10953, at *10 (N.D. Cal. May 26, 2000)("...the fact that a particular matter constitutes a significant source of income to a company can establish a strong inference that the company and its relevant officers knew of easily discoverable additional facts that directly affected that source of income.")(citation omitted); *In re: Tel-Save Sec. Litig.,* No. 98-CV-3145, 1999 U.S. Dist. LEXIS 16800, at *15 (E.D. Pa. October 19, 1999)(holding that defendant knew or should have known of alleged accounting misstatements in connection with certain transactions because such transactions were central to defendant's business).

Moreover, the fact that defendants engaged in "selective disclosure" of material information to Standard Textile Company, an affiliated entity that then promptly filed a form evidencing its intent to divest itself of millions of dollars worth of SRI stock without simultaneously disclosing that information to the public, is indicative of scienter. ¶ 78. Courts have held that even *planned* sales of stock such as Standard Textile's which are never completed can contribute to an inference of scienter. *See In re Datastream Systems, Inc. Sec. Litig.,* No. 6:99-0088-13, 2000 U.S. Dist. LEXIS 1468, at *9 (D.S.C. Jan 31, 2000).

Defendants also insist that the absence of insider trading negates a showing of their scienter. Def. Br. at 26-28. This argument has been consistently rejected by courts both inside and outside the Eleventh Circuit. Defendants are not infrequently found to have acted with scienter despite their failure to sell any stock during the class period. *See*

- 23 -

*In re Cell Pathways, Inc., Sec. Litig.,* No. 99-752, 2000 U.S. Dist. LEXIS 8584, at *19-21

(E.D. Pa. June 20, 2000)(scienter sufficiently pled even though no Defendants were

alleged to have sold insider stock at profit); *In re Digi International, Inc. Sec. Litig.,* 6

F.Supp. 2d 1089, 1097, n.5 (D.C. Minn. 1998)("The Court finds plaintiffs' allegations [of

scienter] sufficient without considering...[the] sale of shares by one of the individual

defendants."); *In re Wells Fargo Sec. Litig.,* 12 F.3d 922, 931 (9th Cir. 1993)(complaint

with no allegations of insider sales upheld as properly pleading scienter); *STI Classic*

*Fund v. Pollinger Indus., Inc.,* 3-96-CV-823-R, 1996 U.S. Dist. LEXIS 21553, at *5-6

(N.D. Tex. Oct. 25, 1996) (motive established in post-PSLRA case despite absence of

insider trading). *See also Voit v. Wondercare Corp.,* 977 F.Supp. 363 (E.D. Pa. 1997)(one

defendant sold no stock; court finds that complaint pleads scienter as to him anyway);

*Freedman v. Value Health, Inc.,* 958 F.Supp. 745 (D. Conn. 1997)(six of nine defendants

did not sell stock; court holds that scienter is pled as to all defendants); *Sunbeam,* 89 F.

Supp.2d at 1339 (court found defendants acted with scienter despite failure to sell stock

by insider defendants); *In re Towne Svcs., Inc, Sec. Litig.,* 2001 U.S. Dist. LEXIS 9065,

*33 (N.D. Ga. June 4, 2001)(court denied motion to dismiss 10b claims despite the fact

that no defendants sold any stock during the class period); *In re Unicapital Corp. Sec.*

*Litig.,* 2001 U.S. Dist. LEXIS 14742, at *47 (M.D. Fla. Aug. 21, 2001)(scienter

adequately pleaded even though defendants were not alleged to have sold any company

stock during the class period); *Vision Twenty-One,* 2000 U.S. Dist. LEXIS 14742 *11(in

denying defendants' motion to dismiss, in part, Court held plaintiffs sufficiently pleaded

- 24 -

scienter in spite of the fact that defendants were not alleged to have sold stock during the class period).

> ### 2.    Defendants' Accounting Violations Contribute to a Strong Inference Of Severe Recklessness

Despite defendants' express representations that SRI's financial statements had been prepared in conformity with GAAP, they were not. ¶¶80-83.   Violations of GAAP, when coupled with other evidence of fraud, create a strong inference of scienter.[21] *See In re Envoy Corp. Sec. Litig.,* 133 F. Supp.2d 647, 660 (M.D. Tenn. 2001)("GAAP violations along with other circumstances, can create a strong inference of scienter"). *Accord Miller Industries,* 12 F. Supp.2d at 1332; *Gross v. Medaphis Corporation,* 977 F. Supp. 1463, 1467 (N.D. Ga. 1997); *In Re: World Access, Inc. Sec. Lit.,* 110 F. Supp.2d 1348, 1356 (N.D. Ga. 2000)(specifically alleged violations of GAAP which allegedly result in improperly overstated revenue are sufficient to set forth a claim of fraud for the purposes of Rule 10b-5).[22]

---

[21]"The Financial Accounting Standards of GAAP and the anti-fraud rules promulgated under §10(b) of the 1934 Act serve similar purposes and courts have often treated violations of the former as indicative that the latter were also violated." *In Re The Baan Company Sec. Litig.,* 103 F. Supp.2d 1, 21 (D.D.C. 2000) (Emphasis supplied).   In fact, financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate.  17 C.F.R. §210.4-01(a)(1).

[22]*Malone v. Microdyne Corp.,* 26 F.3d 471 (4th Cir. 1994)(intentional and material violations of GAAP alone are sufficient to establish scienter.); *Marksman Partners, L.P. v. Chantal Pharmaceutical Corp.,* 927 F.Supp. 1297, 1305 (C.D. Cal. 1996) ("A company's overstatement of revenues...in violation of [GAAP] can constitute a false or misleading statement of material fact necessary to establish a Section 10(b) and 10b-5 violation"); *In re Discovery Zone Sec. Litig.,* 943 F.Supp. 924, 937 (N.D. Ill. 1996)

a.  **Defendants failed to Properly Account for Interest Rate Swaps**

The Company guaranteed certain financial transactions (which exposed the Company to a risk of loss) "on May 28, 1999 and July 1, 1999." ¶¶ 63-64.  As alleged, these guarantees were never disclosed during the Class Period although GAAP (FASB Statement No. 5) provides that such guarantees "shall be" disclosed as a contingency of the Company.  ¶ 65.

The financial statements presented within the Company's December 31, 2000 Form 10-K contained a note (Note F--Commitments And Contingencies) purporting to disclose all of the Company's material commitments and contingencies.  Similarly, the financial statements presented within the Company's March 31, 2001, June 30, 2001, and September 30, 2001 Form 10-Qs, each (in note 3) purport to disclose all of the Company's material commitments and contingencies.  However, these documents violate GAAP (FASB Statement No. 5) and effectively conceal the existence of a material risk by failing to disclose the existence of the Company's guarantees and the contingencies associated therewith.  ¶ 65.

The Complaint also alleges that defendants, who negotiated the guarantees and signed the guarantee documents, knew of these guarantees and either knowingly or recklessly failed to disclose the material contingency arising therefrom.  ¶ 66.  The

---

(use of improper accounting methods to artificially inflate profits in violation of GAAP was itself sufficient to support an inference of fraudulent intent).

ramifications of this non-disclosure were significant.  As noted in the Complaint: "An April 2, 2002 analyst report issued by *Baird* commented on the undisclosed swaps, stating: "[w]e would avoid this stock as investors may not have realized the presence of off-balance sheet financing for the two most recent process plants."  ¶¶ 73, 104.

Defendants do not address these allegations regarding their failure to provide the required disclosures with respect to the Company's material commitments and contingencies.  Instead, defendants focus on an entirely different area of GAAP (FASB Statement No. 133) dealing (not with disclosure of contingencies but) with recognition of losses.  Def. Br. 37-43.  Defendants argue that they erred and "misinterpreted" a "new" and "extraordinarily complex" accounting pronouncement (FASB Statement No. 133), and that the impact of such error was "minimal" because it had the effect of "lowering net income 5%."[23]  Def. Br. at 2.  But as GAAP (Statement Of Financial Accounting Concepts No. 2) states, as a "rule of thumb," any accounting adjustment within "5-10 percent of net income is widely used as a general materiality criterion."[24]

---

[23]The initially reported net income was overstated by 5.8%.

[24]Even if the magnitude of the misstatement had not reached 5%, the misstatement was material pursuant to SEC guidance promulgated on August 12, 1999 (Staff Accounting Bulletin No. 99) stating:

> This staff accounting bulletin expresses the views of the staff that exclusive reliance on certain quantitative benchmarks to assess materiality in preparing financial statements and performing audits of those financial statements is inappropriate; misstatements are not immaterial simply because they fall beneath a numerical threshold.
>                                         *****

Defendants' belated claim of erroneous interpretation is transparent when held up against the test of their own previous conduct. As FASB Statement No. 133 was issued in June 1998, defendants had ample opportunity to study its impact on the Company's financial reporting. And it is clear Defendants did just this, as evidenced by the Company's representation in its December 31, 2000 Form 10-K. ¶ 51.

> In June 1998, the Financial Accounting Standards Board (FASB) issued Statement of Financial Accounting Standards No. 133 ACCOUNTING FOR DERIVATIVE INSTRUMENTS AND HEDGING ACTIVITIES. In June 2000, FASB issued Statement of Financial Accounting Standards No. 138 ACCOUNTING FOR CERTAIN DERIVATIVE INSTRUMENTS AND CERTAIN HEDGING ACTIVITIES - AN AMENDMENT OF FASB STATEMENT NO. 133. These statements require all derivatives to be recorded on the balance sheet at fair market value and establishes new accounting rules for hedging instruments, and are effective for fiscal years beginning after June 15, 2000. The Company currently does not have any derivative instruments and is not involved in hedging activities and therefore does not expect these Statements to have an impact on its results of operations or financial position.

Defendants knew of the guarantees and of the requirements of FASB Statement No. 133 in connection therewith. *Id.* Nonetheless, defendants represented that they did

---

> The staff is aware that certain registrants, over time, have developed quantitative thresholds as "rules of thumb" to assist in the preparation of their financial statements, and that auditors also have used these thresholds in their evaluation of whether items might be considered material to users of a registrant's financial statements. One rule of thumb in particular suggests that the misstatement or omission of an item that falls under a 5% threshold is not material in the absence of particularly egregious circumstances, such as self-dealing or mis-appropriation by senior management. The staff reminds registrants and the auditors of their financial statements that exclusive reliance on this or any percentage or numerical threshold has no basis in the accounting literature or the law.

not expect this GAAP provision "to have an impact on its results of operations or financial position." *Id.* As the Complaint alleges, having shown an awareness of FASB Statement No. 133 and its implications, defendants either knowingly or recklessly failed to provide for losses in compliance with that provision. ¶ 63. Moreover, the Complaint alleges that defendants failed to comply with the disclosure mandates of SEC Staff Accounting Bulletin 74. ¶¶ 109-110.

> **b.**    **Defendants' Restatement Contributes to an Inference of Severe Recklessness**

Defendants argue that SRI's third quarter error was not a matter of booking "phantom" revenues, but was simply a question of recognizing legitimate revenues slightly early, often by as little as a single day, and that SRI's third quarter restatement reduced the Company's third quarter net income by only $280,000 and reduced earnings per share by only a few pennies per share (from $.26 to $.22 per diluted share). As particularized in the Complaint, SRI's restatement of third quarter financial results was not the result of an "error" with regard to the Company's revenue recognition; ¶¶ 28-39, but the fallout from a well orchestrated scheme to fraudulently boost the revenues the Company reported to Wall Street, which scheme included: (a) invoicing customers and recognizing sales from product shipments that had not been delivered to or accepted by the customers; and (b) using "repeat deliveries" to flood customers with products in excess of the customer orders, and storing products in an off-site warehouse if the excess was discovered by the customers. ¶¶ 30, 32, 39. If customers caught on to the "product

- 29 -

dump," employees were instructed to blame SRI's computer system. ¶ 32  The scheme

was intended to bolster the price of the Company's stock by preserving the Company's

image as a company that reported "highly predictable revenue and EPS stream."[25] ¶¶ 28,

87.

Despite defendants' self-serving characterization of the Company's restatement as

a matter of only a "few pennies" per share (Def. Br. at 8), and thus (as defendants assert)

immaterial,[26] defendants' disingenuous position is strongly rejected by the market.  On

November 27, 2001, when the Company announced that its previously reported earnings

per share had been materially overstated by 18% and had not met analysts' expectations

for the third quarter, the price of the Company's stock plunged over 40%.[27]  ¶¶ 94, 96, 98.

---

[25]As noted in ¶ 103: "On February 21, 2002, the Securities and Exchange
Commission issued a Formal Order of Private Investigation with respect to the Company.
The investigation concerns the transactions underlying the Company's restatement of its
financial results announced during its fourth quarter of 2001." *Id.*  The fact that this
investigation is still ongoing suggests that the transactions giving rise to the restatement
were far from legitimate.

[26]In *Ganino*, the Second Circuit rejected trial court's imposition of a numerical
benchmark as the sole means of determining materiality -- the position defendants
advocate here -- and endorsed the SEC's view that the materiality is generally a question
of fact to be resolved by analyzing qualitative and quantitative factors.  See *Ganino,* 228
F.3d at 164.

[27]Defendants state that the November 27th press release also announced that the
Company did not expect to meet analysts' expectations for the fourth quarter and that this
announcement  was "of far greater significance to the market." This unsupported and
conclusory statement raises an issue of fact that is not appropriately decided on a Motion
to Dismiss. Def. Br. at 8.

c.     **Plaintiffs' Allegations Concerning Loss of
Customers are Material**

The Complaint alleges that defendants, starting in late 2000, failed to disclose that

SRI lost 25% of its hospital customers in the Dallas territory and other hospitals in the

California territory, as a result of defendants' price increases for reusable products and

SRI's failure to properly notify customers of this price increase. ¶¶ 47-49. Defendants

argue that: (1) plaintiffs have failed to quantify how these losses were material; and (2)

SRI disclosed that is was eliminating smaller, less profitable customers. Def. Br. at 34-

36.

Defendants' materiality argument is again misplaced. A complaint may not be

properly dismissed pursuant to Rule 12(b)(6) on the grounds that the alleged

misstatements or omissions are not material unless they are "so obviously unimportant to

a reasonable investor that reasonable minds could not differ on the question of their

importance." *In re Valujet Inc. Sec. Lit.*, 984 F. Supp. 1472, 1478 (N.D. Ga. 1997);

*Marksman Partners L.P. v. Chantal Pharm.*, 927 F. Supp. 1297, 1306 (C.D. Cal.

1996)(quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)). *See also Press*

*v. Chemical Inv. Servs. Corp.* 166 F. 529, 538 (2d Cir. 1999); *UniCapital*, 149 F. Supp.

2d at 1355. The loss of customers was especially material to SRI because it would take

SRI a significant amount of time to replace these lost customers, and the resulting loss of

revenue. And, as SRI admitted, it takes between six and eighteen months to obtain a

purchase commitment from a new customer. ¶ 59.

- 31 -

Defendants' argument that the loss of customers was planned and fully disclosed

is also unavailing, as this revisionist position is inconsistent with defendants' own public

explanations.  Def. Br. at 36.  Further, plaintiffs do not claim that SRI failed to disclose

that the Company was eliminating "smaller, less profitable customers," as defendants

contend, Def. Br. at 35-37, ¶ 55, but rather that former employees have revealed that

many customers terminated SRI's services as a result of defendants trying to bury price

increases for reusable products.  ¶¶ 46-49.

Defendants themselves characterized one reason for SRI's third quarter shortfall

as an "unanticipated loss of several customers."  ¶ 96.  As they acknowledge, the loss of

customers announced in November 2001 "should not be confused with SRI's planned and

announced intention to eliminate small, less profitable customers."  Def. Br. at 29, n. 21.

But defendants cannot camouflage SRI's loss of customers that resulted from such

customers discovering buried price increases (which loss SRI did not disclose) with

customer attrition resulting from SRI's planned intention to eliminate small, less

profitable customers (which was disclosed).[28]

---

[28]Defendants also argue that they are protected by the PSLRA's safe harbor, yet
they fail to identify any "forward-looking" statements alleged to be false and misleading
in the Complaint.  (*See* Def. Br. at 29-32).  To fall within the PSLRA's safe harbor, a
statement must be: (1) forward-looking; and (2) accompanied by "meaningful cautionary
language."  *Harris v. Ivax*, 182 F.3d 799 (11th Cir. 1999); 15 U.S.C. § 78u-5(c)(1)(B).  If
the forward-looking statements are not accompanied by cautionary language, plaintiffs
must show that the defendants made the statements at issue with actual knowledge that
they were false and misleading.  15 U.S.C. § 78u-5(c)(1)(B); *PSS World Medical*, 2002
U.S. Dist. LEXIS 14887, at *21.  The statutory safe harbor <u>does not</u> protect defendants
from liability based on statements that misrepresent historical or current facts – even if

The undisclosed customer defections were also a material adverse trend which should have been disclosed.[29]   Moreover, the SEC has emphasized that "[i]nvestors have legitimate expectations that public companies are making, and will continue to make, prompt disclosure of significant corporate developments."   SEC Release No. 18271, [1981-1982 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 83,049, at 84,618 (November 19, 1981).   Many cases have upheld complaints alleging that defendants failed to disclose a material, adverse trend, similar to defendants' failure to reveal the material loss of customers.   *See, e.g., In re Scholastic,* 252 F.3d at 76; *In re Next Level Systems, Inc.* 1999 U.S. Dist. LEXIS 5653 at *12 (N.D. Ill. March 31, 1999); *Computer Assocs.,* 75 F.

---

those statements are accompanied by meaningful cautionary language. *Id.* at *21 (rejecting argument that press releases containing financial results were statements of future goals and beliefs, and holding that they were "hard" financial results).

It is also well-settled that the inclusion of some cautionary language does not automatically shield the defendants from their false statements. *See Insurance Management Insurance Group, Inc. Sec. Litig.,* 2001 U.S. Dist. LEXIS 9962, at *30-32 (M.D.Fla. July 11, 2001) (detailed cautionary statements regarding risks of acquisition and flood-mapping services inadequate where the undisclosed true "hard" fact was that company was simply not producing in the area of flood-mapping services due to problems of merger); *Windmere-Durable,* 2000 U.S. Dist. LEXIS 9772 at *42 (cautionary language must be specific and, in the case of a material omission, must be sufficiently 'meaningful', such that it discloses 'important factors that could cause actual results to differ materially from those in the forward looking statement.")).

Defendants' statements are neither forward-looking nor accompanied by meaningful cautionary language, and their safe harbor argument should be disregarded.

[29]Item 303 of Regulation S-K imposes a duty to disclose in periodic reports filed with the SEC "known trends or any known demands, commitments, events or uncertainties" that are reasonably likely to have a material impact on a company's sales revenues, income or liquidity, or cause previously filed financial information not to be indicative of future operating results.

- 33 -

Supp.2d at 73; *Manavazian v. Atec Group*, 160 F. Supp. 2d 468, 480 (E.D. N.Y. 2001); *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 590 (D.N.J. 2001).

**C.    *The Complaint Adequately Pleads the Involvement and Scienter of Each of the Individual Defendants***

**1.    Each of the Individual Defendants Acted With Knowledge or Severe Recklessness**

The Complaint alleges each of the Individual Defendants' knowledge or severe recklessness and details their specific involvement, by alleging who signed each of the false financial statements, who prepared (and who was quoted in) the Company's press releases, annual reports, and quarterly reports, and who directed the improper conduct.[30] For example, Isel was a hands-on manager"[31] who made most of the false and misleading statements at issue. *See, e.g.*, ¶¶ 14, 50, 91-93. Similarly, all of the finance aspects of the business were "worked out of corporate" in Tampa, which was under defendant Boosale's

───────────

[30]Defendants rely heavily on cases that hold that failure to allege that any of the Individual Defendants acted with the requisite state of mind should result in a dismissal of the allegations. Def. Br. at 18-24. SRI, however, is also separately liable as a corporate defendant. Courts have uniformly held that the acts of a corporate officer that are intended to benefit a corporation to the detriment of outsiders are properly imputed to the corporation. *See Seidman & Seidman v. Gee*, 625 So. 2d 1, 2 (Fla. Dist. Ct. App. 1992). Moreover, the knowledge of individuals who exercise substantial control over a corporation's affairs is properly imputable to the corporation. *See American Standard Credit, Inc. v. National Cement Co.*, 643 F.2d 248, 270-71 & n. 16 (5th Cir. 1981). Accordingly, consistent with the general principles of agency and corporate law, the scienter of SRI's officers is properly imputed to SRI itself.

[31]In *Zuckerman*, the court found that the Chief Executive Officer of the company acted with scienter where he was a "hands-on manager" who regularly visited company store locations. *Zuckerman*, 2000 U.S. Dist. LEXIS 14676 at *15.

control. ¶15. A former production manager based in Carrolton, Texas confirmed that Isel

and Boosales toured the Carrolton facility regularly to ensure that the facility was

complying with the company's "SOP" (standard of operations procedures"). *Id.* As

Chief Financial Officer of the Company during the Class Period, Boosales had an

independent responsibility for the Company's financial statements, and the responsibility

to ensure that the Company reported accurate financial information to the SEC and to

public investors. *Id.* The responsibilities of the corporate officer in charge of accounting

and financial reporting are well-established and they include "the maintenance of

adequate internal controls[s] and . . . the preparation of accounting records and financial

statements," (Miggs and Miggs, *Financial Accounting* (1998, 9th ed.) at 528), and the

involvement in "planning and decision making at all levels and across all functional areas

of the enterprises." (*See* Hilton, Ronald W., *Managerial Accounting* (3d ed. 1997) at 11).

*Id.*

Wayne Peterson, as SRI's Chief Operating Officer, reported directly to Isel (who

was also his brother-in-law), and was charged with the day-to-day operation of SRI. ¶ 16.

In addition, according to an Account Manager employed at SRI's Stockton, California

facility, a Stockton Distribution Supervisor, who was ordered by the SEC to testify in

Washington, D.C. about the suspicious third quarter sales activities, informed him that

she saw countless company documents pertaining to third quarter events (including e-

mails and hard-copies) that the SEC had gathered from SRI, *the majority of which had*

*"Wayne Peterson's name all over them." According to this Supervisor, Peterson was*

- 35 -

*the "main-guy" behind the suspicious third quarter 2001 activities, and the SEC was*

*primarily focusing on him.* ¶ 16.

Thus, as demonstrated in the Complaint, Plaintiffs adequately allege scienter as to

each Individual Defendant. *See generally, Danis*, 73 F. Supp.2d at 939, n.9 ("The exact

extent of each of the individual defendant's role and duties within [the Company] and

their corresponding knowledge, cannot be ascertained until discovery. "); *In re Reliance*

*Sec. Litig.*, 91 F. Supp. 2d 706, 720 (D. Del. 2000) ("Although the complaint does not

attribute any specific misstatement to these defendants, the wrong complained of that "the

Company maintained declining loan loss reserves...is the kind of matter that these

defendants may have been personally responsible for overseeing.").[32]

---

[32]Defendants mistakenly rely on *In re Sunterra Corp. Sec. Litig.*, 199 F. Supp.2d 1308 (M.D. Fla. 2002). In *Sunterra*, the Court found that plaintiffs failed to adequately plead scienter because they merely relied on defendants' positions as CEO and CFO and concluded that they "must have known" of delinquent receivables. *Id.* at 1324. An important factor in the Court's decision was that the defendants "had held their respective positions just over a year prior to the January 2000 announcement and, according to Plaintiffs' own assertions, the fraudulent scheme was initiated in 1997." *Id.* at 1325. In marked contrast, plaintiffs here do not claim that defendants "must have known" of the fraudulent conduct simply because of their positions at the Company. Rather, plaintiffs detail how defendants knew, or recklessly disregarded, that their Class Period statements were materially false and misleading. *See* ¶¶ 14-17, 50, 91-93. Moreover, both Isel and Boosales held their positions at SRI throughout the Class Period. Also, as alleged in the Complaint, Peterson was directly implicated in the fraudulent conduct that occurred in the third quarter of 2001. ¶ 16.

- 36 -

## 2.   The Group Pleading Presumption Applies

Isel, Peterson and Boosales signed key false documents such as the March 30,

2001 10-K. ¶ 50.  In *Howard v. Everex Systems, Inc.*, 2000 U.S. App. LEXIS 23973, *8-

10 (9th Cir. 2000), the Ninth Circuit recently affirmed that corporate officers are liable for

misrepresentations in financial documents they sign such as Reports on Forms 10-Q and

10-K.  Accordingly these defendants, as signatories are liable under §10(b).[33]

While Isel made most of the false statements in the press releases, Boosales and

Peterson may also be held liable under the "group publication" doctrine.  The group

publication doctrine provides that allegations of securities fraud based on false or

misleading statements in "prospectuses, registration statements, annual reports, press

releases or other group-published information," are "presumed to be the collective actions

of the officers and directors who are directly involved in the day-to-day affairs,

management or control of the Company." *In re Checkers Sec. Litig.*, 858 F. Supp.

1168,1.178 (M.D. Fla. 1994) ("no specific connection between the fraudulent

representations and particular defendants is necessary in cases of corporate fraud brought

---

[33]Defendants rely on the opinion in *Cheney*, where the court dismissed certain individual defendants, in support of their argument that allegations based only on a defendant's position at the company are insufficient to allege scienter. Def. Br. at 23. However, defendants fail to cite to Judge Gold's decision on a motion for reconsideration, holding that "allegations that individuals, because of their management and/or director positions, could control a company's general affairs, including the content of public statements and financial statements are sufficient to state a cause of action for controlling person liability." *See Cheney v. Cyberguard,* Case No. 98-6879-CIV-GOLD, slip. op. at 2-3 (S.D. Fla. March 21, 2001)(Exhibit A).

against insiders and affiliates where the false information is disseminated in group

published documents).  Indeed, the application of the group pleading doctrine by Courts

in this Circuit has been well established and was just recently reaffirmed. *See In re*

*Sunbeam*, 89 F. Supp. 2d 1326; *Sensormatic*, 2002 U.S. Dist. LEXIS 10715 at \*12-\*13.

## IV.    CONCLUSION

For all of the foregoing reasons, the Court should deny Defendants' Motion to

Dismiss in its entirety.

DATED: September 27, 2002                    Respectfully submitted,

**CAULEY GELLER BOWMAN &
COATES, LLP**

By:_____
Howard K. Coates, Jr.
Florida Bar No. 0714305
Jack Reise
Florida Bar No. 058149
One Boca Place
2255 Glades Road, Suite 421A
Boca Raton, FL  33431
Tel: (561) 750-3000
Fax: (561) 750-3364

**MILBERG WEISS BERSHAD
HYNES & LERACH LLP**
Kenneth J. Vianale
Fla. Bar No. 169668
Maya Saxena
Fla. Bar. No. 0095494
5355 Town Center Road, Suite 900
Boca Raton, FL  33486
Tel: (561) 361-5000
Fax: (561) 367-8400
**Co-Lead Counsel**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished by U.S. Mail this 27th day of September, 2002 to:

**HOLLAND & KNIGHT LLP**
Tracy A. Nichols
Mitchell E. Herr
Louise M. Braise
701 Brickell Avenue, Suite 3000
P.O. Box 015441
Miami, FL 33101
Tel: (305) 374-8500
Fax: (305) 789-7799

and

**HOLLAND & KNIGHT LLP**
John D. Mullen
P.O. Box 1288
Tampa, FL 33601-1288
Tel: (813) 227-8500
Fax: (813) 229-0134

**Attorneys for Defendants**

_____
Jack Reise

# DOCUMENT, ATTACHMENTS, OR EXHIBITS NOT SCANNED

## FOR THE FOLLOWING REASON(S):

____ **PHYSICAL SIZE OF PAPER** (LARGER OR SMALLER THAN 8 ½ X 11)
____ **EXCEEDS PAGE LIMIT**
____ **DOUBLE-SIDED PAGES**
____ **BINDING CANNOT BE REMOVED WITHOUT DAMAGING DOCUMENT**
____ **CASE LAW**
____ **SOCIAL SECURITY RECORD/ANSWER**
____ **DEPOSITION/TRANSCRIPT**
____ **NON-REMOVABLE EXHIBIT TABS**
____ **COLORED PAPER OR COPIED PHOTOGRAPHS**
____ **SEALED**
X **OTHER** _State court record_

# PLEASE REFER TO COURT FILE FOR COMPLETE DOCUMENT